FILED IN CHAMBERS
U.S.D.C. - Atlanta

SEP 0 2 2020

James N. Hatten, Clerk
By: _____ Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

BERKELEY VENTURES II, LLC,

          Plaintiff,

v.

SIONIC MOBILE CORPORATION and
RONALD D. HERMAN,

          Defendants.

CIVIL ACTION NO.
1:19-CV-5523-ODE

ORDER

This matter is before the Court on several motions: (1)
Defendant Sionic Mobile Corporation's Motion to Disqualify
Busch, Slipakoff, Mills & Slomka, LLC as Counsel of Record
(hereinafter "Motion to Disqualify") [Doc. 9]; (2) Defendant
Sionic Mobile Corporation's Motion to Dismiss [Docs. 10, 11];[1]
Defendant Sionic Mobile Corporation's Motion to Exceed Page
Limitations [Doc. 14]; Defendant Sionic Mobile Corporation's
Motion to Lift Seal and for Leave to File Additional Reply Brief
in Support of its Motion to Disqualify [Doc. 25]; and Plaintiff
Berkeley Ventures II, LLC's Request for Hearing on Motion to
Dismiss (hereinafter "Motion for a Hearing") [Doc. 32]. For the
reasons provided below, the Court DENIES Defendant Sionic's
Motion to Disqualify, Defendant Sionic's Motion to Dismiss,
Defendant Sionic's Motion to Lift Seal and for Leave to File
Additional Reply Brief in Support of its Motion to Disqualify,

---

[1]Doc. 10 is the Memorandum in Support of Sionic Mobile
Corporation's Motion to Dismiss and Doc. 11 is Defendant Sionic
Mobil Corporation's Motion to Dismiss. The Court therefore
treats Docs. 10 and 11 as Defendant Sionic's Motion to Dismiss.

and Plaintiff's Motion for a Hearing. The Court GRANTS Defendant Sionic's Motion to Exceed Page Limitations.

## I.   INTRODUCTION

The facts from Plaintiff's complaint [Doc. 1] are as follows. Plaintiff Berkeley Venture II, LLC ("Plaintiff") is a private equity fund affiliated with Berkeley Capital Partners, LLC [Doc. 1 at 1-2 ¶ 1]. Defendant Sionic Mobile Corporation ("Sionic") was formed as a Georgia limited liability company in January of 2010 by its founder, Defendant Ronald D. Herman ("Herman") [Doc. 1 at 4 ¶ 9]. Plaintiff alleges that since Defendant Sionic's formation, Defendant Herman and certain members of its board of directors (hereinafter, "the Board") have systematically attempted to raise capital from a variety of investors claiming Sionic was on the cusp of experiencing exponential growth, sustained profits, and immediate acquisition that would result in financial security for investors who took advantage of this "once in a lifetime" investment opportunity [Doc. 1 at 4 ¶ 10]. Plaintiff claims that Defendants and the Board used deceptive sales strategies consisting of artificial deadlines, shortened due diligence periods, fabricated scarcities of shares, grossly inflated projections, false and misleading sales literature, alleged partnerships, and overstated technology capabilities [Doc. 1 at 3 ¶ 11]. Sionic also allegedly raised capital by facilitating sales of "soon to be expiring" unexercised employee warrants to prospective investors [Doc. 1 at 5 ¶ 13].

Sionic boasts that it has raised more than $18 million since its inception in 2010 [Doc. 1 at 5 ¶ 12]. However,

according to Form D Notices of Exempt Offering of Securities filed with the SEC and various states, Sionic has only raised: (i) $1,290,000 out of $2,500,000 offered on June 6, 2011; and (ii) $0 out of $3,000,000 offered on September 25, 2013 [Doc. 1 at 5 ¶ 12; Doc. 1-1]. Plaintiff contends that despite its fund-raising efforts, Sionic continued to underperform, failed to meet any of the promised growth metrics, failed to generate significant revenue, and failed to complete its technology platforms [Doc. 1 at 5-6 ¶ 14]. Instead, Sionic continued to operate with substantial losses exceeding millions per year; in 2017 alone, Sionic lost a total of $4.8 million [Doc. 1 at 6 ¶ 14].

In an effort to keep investors from lodging formal complaints or filing suits, Defendants allegedly attempted to pacify investors [Doc. 1 at 6 ¶ 16]. Plaintiff claims, upon information and belief, that some investors donated their shares to one or more charities at inflated share prices to generate charitable tax deductions, thereby enabling Defendants to continue raising capital for Sionic without publicizing the company's losses [Doc. 1 at 6 ¶¶ 17, 18].

Plaintiff's Chief Executive Officer, Anthony Palazzo ("Palazzo"), was introduced to Defendants by a Board member via e-mail (the "Introductory E-mail") on October 25, 2017 [Doc. 1 at 7 ¶ 20]. Attached to the e-mail was a summary of Sionic, dated October 2017 (the "Executive Summary") and a company fact sheet dated October 12, 2017 (the "Fact Sheet") [Doc. 1 at 7 ¶ 21]. In its e-mail, Sionic encouraged Plaintiff to invest in Sionic at $2.00 per share, valuing the company at approximately

$85 million [Doc. 1 at 7 ¶ 22].  The e-mail stated, in relevant part:

> I wanted to just make it clear that they have a week(s) to close out investors . . . they could very well be done raising funds in 10 days [and] this is probably not going to be enough time for your normal due diligence for your clients to consider, but it might be something you can get comfortable with quickly for smaller personal investments.  This is my favorite tech company in our portfolio. . . . I personally did the initial technology due diligence review 2 years ago for the Series B round.

[Doc. 1 at 8 ¶ 23].  Defendant Herman thereafter invited Plaintiff to meet and visit Sionic offices in Atlanta, saying "[it's] important for me to disclose current state and step through financial pro formas" [Doc. 1 at 8 ¶ 24].  Two dates later, on October 27, 2017, Plaintiff joined a conference call to discuss Sionic's history, business plan, and its need for capital [Doc. 1 at 8 ¶ 24].

On October 27, 2017, Palazzo asked Defendant Herman to send him any information on the prospective investment, including a private placement memorandum, cap table, slide presentation, and other diligence materials available [Doc. 1 at 8 ¶ 25]. Defendant Herman wrote in response "our Offering Memorandum is two years old and of no relevance" [Doc. 1 at 8 ¶ 25].  Instead, he provided a cap table showing approximately 38.4 million shares of stock, options, and warrants issued and outstanding [Doc. 1 at 8-9 ¶ 25; Doc. 1-5].

Representatives of Plaintiff met with Sionic at its headquarters in Atlanta on October 31, 2017 [Doc. 1 at 9 ¶ 26]. Following this meeting, Palazzo requested a breakdown of the proposed use of funds [Doc. 1 at 9 ¶ 26].  Sionic responded on

-4-

November 1, 2017, outlining the proposed use of funds for 90 days (the "Use of Funds E-mail") [Doc. 1 at 9 ¶ 26; Doc. 1-6]. Plaintiff also received an updated pro forma via e-mail, showing detailed revenue and projections for each customer [Doc. 1 at 9 ¶ 26; Doc. 1-7]. On November 2, 2017, Plaintiff requested and received a schedule of debt from Sionic showing outstanding notes owed to Defendant Herman and other Board members [Doc. 1 at 9 ¶ 27; Doc. 1-8]. On November 8, 2017, Defendants sent Plaintiff a number of investment documents to be signed including: (i) a Subscription Agreement; (ii) an Investor Questionnaire; (iii) Sionic's Amended and Restated Shareholder Agreement; (iv) Joinder to the Shareholders' Agreement; and (v) Sionic's wire instructions (collectively, the "Investment Documents") [Doc. 1 at 10 ¶ 28; Doc. 1-9]. On November 20, 2017, Defendant Herman sent Plaintiff an e-mail (the "E-Mail Update") to provide an update on Sionic's business activities and encourage Plaintiff to finalize its investment [Doc. 1 at 10 ¶ 29; Doc. 1-10]. Plaintiff sent Sionic signed copies of the Investment Documents and wired $1,600,000 into Sionic Bank's account for 800,000 shares of common stock two days later on December 7, 2017 [Doc. 1 at 10 ¶ 30; Doc. 1-11].

Plaintiff contends its due diligence period began on October 25, 2017 with the Introductory E-mail, and was shortened as a result of the false deadlines imposed by Defendants through the investment date of December 7, 2017 [Doc. 1 at 11 ¶ 31]. Almost immediately after accepting Plaintiff's investment, Defendants allegedly began backtracking on their written promises, guaranteed partnership agreements, and revenue

-5-

projections [Doc. 1 at 11 ¶ 32].  In an e-mail dated January 19, 21018, a Board member informed Plaintiff "(1) not to expect 'a lot of revenue in Q1' despite promises days earlier of $10 million in Q1 revenue as stated in the Proforma Spreadsheet and (2) that the key airline relationship projected to onboard 30,000,000 users on January 1, 2018 according to the Executive Summary was not being pushed so resources could be focused 'on other endeavors'" [Doc. 1 at 11 ¶ 32; Doc. 1-12].

Plaintiff also contends that Defendants made a number of material misrepresentations to Plaintiff on which Plaintiff relied to make its investment decision.  According to Plaintiff, the Executive Summary, Fact Sheet, and Proforma Spreadsheet provided by Defendants contained a number of such false and misleading statements [see Doc. 1 at 12-17 ¶ 34-35, and at 19-21 ¶ 40].  Plaintiff claims the Executive Summary made the following false misrepresentations:

- "We connect brick and mortar merchants with millions of consumers" [Doc. 1 at 12 ¶ 34].  Plaintiff claims that Defendants were not connecting with millions of consumers in 2017, but instead had only 1,200 subscribers at the time.
- "General Motors Partnership" - "we earn 50% of the $20-$40 CPM rate" [Doc. 1 at 13 ¶ 34].  Plaintiff claims that Defendant Sionic did not have a partnership or formal agreement with GM in 2017 that allowed for this fee sharing arrangement.
- "[P]ayment commerce platform" - "we earn ½ to 5% of POS transaction amounts" [Doc. 1 at 13 ¶ 34].

-6-

Plaintiff claims no such commerce platform ever generated sales revenue at these levels.

- "Loyalty app partners in auto, airline, banking, hotel, mobile phone, insurance and other channels" [Doc. 1 at 14 ¶ 34]. Plaintiff claims no such formal partnerships or agreements ever existed.

- "30,000,000 users on January 1 for Airline 1" [Doc. 1 at 14 ¶ 34]. This representation was included as part of a graph describing how and when Sionic was reaching customers. It indicated that Defendant Sionic had finalized a deal with a major airline that would generate 30,000,000 users beginning on January 1, 2018. Plaintiff claims Defendant Sionic had no such finalized agreement in place with any airline and did not have the technology or capacity to capture 30,000,000 users in 2017.

- "25,000,000 users on January 1 for Healthcare 1" [Doc. 1 at 14-15 ¶ 34]. This representation was included as part of the graph described above. It indicated that Defendant Sionic had finalized a deal with a major healthcare provider that would generate 25,000,00 users beginning on January 1, 2018. Plaintiff claims Defendant Sionic had no such finalized agreement in place with any healthcare provider and did not have the technology or capacity to capture 25,000,000 users in 2017.

- "Exponential growth projections" [Doc. 1 at 15 ¶ 34]. Plaintiff contends the exponential growth projected by

-7-

Defendant Sionic of $274,317,184 in sales in 2018 and $1,395,166,306 in sales in 2019 was not possible because Sionic had not actually formalized agreements with any of the strategic partners and did not have the technology or capacity to support these projections.

- "$18.7 million funded" [Doc. 1 at 16 ¶ 34]. Plaintiff claims Defendant Sionic falsely represented that it had already raised $18.7 million in capital by October 2017.

- "12 patents and trademarks" [Doc. 1 at 16 ¶ 34]. Plaintiff contends Defendant Sionic maintained only one patent and therefore falsely represented the total number of Defendants' intellectual property rights.

Plaintiff contends that the Fact Sheet contained the following false and misleading statements:

- "28 full time employees and contractors" [Doc. 1 at 17 ¶ 35]. Plaintiff claims Defendant Sionic employed a few individuals in 2017, but it did not have the represented total number of full time employees at the time the Fact Sheet was provided to Plaintiff.

- "Multiple non-disclosed patents pending" [Doc. 1 at 17 ¶ 35]. Plaintiff claims Defendant Sionic did not have any non-disclosed patents pending.

Plaintiff contends the Proforma Spreadsheet contained false and misleading statements regarding projected revenue with companies such as General Motors, Carrabbas, Five Guys, Starbucks, and JetBlue, when in actuality Defendant Sionic had

-8-

actually never finalized deals with these companies [see Doc. 1 at 19-21 ¶ 40]. Plaintiff also contends that Defendant Herman made a series of material misrepresentations during an in-person meeting on October 31, 2017 [see Doc. 1 at 21-25 ¶¶ 41-45].

In its Use of Funds E-mail, Defendants allegedly agreed not to use any of Plaintiff's investment to repay loans from company executives and board members, but instead to spend $400,000 on Compliance and Security, $300,000 on Artificial Intelligence, $250,000 on order/pay ahead, $150,000 on automotive platform integration, $50,000 on beacons and $700,000 to offset operating losses [Doc. 1 at 17-18 ¶ 36]. However, upon Plaintiff's information and belief, Sonic did not use Plaintiff's investment as allocated in the Use of Funds E-mail, instead repaying loans from Defendant Herman and others in direct contradiction to the promises made to Plaintiff before its investment [Doc. 1 at 18 ¶ 37].

Sionic also provided Plaintiff with a written Debt Schedule in which Defendant Herman represented he had loaned Sionic more than $550,000 [Doc. 1 at 18 ¶ 38]. However, upon Plaintiff's information and belief, this was simply delayed compensation for salaries and benefits Herman claimed he was entitled to receive from the company [Doc. 1 at 18 ¶ 38]. Plaintiff contends these alleged "loans" were paid back to Herman after Plaintiff's investment [Doc. 1 at 18 ¶ 38]. Defendants also provided Plaintiff with the November 20, 2017 E-Mail Update, in which Defendant Herman represented that "(1) the agreement with Southwest Airlines was almost complete, (2) the GM soft launch was going 'fine', and (3) Xevo, NorthOut and Freedome Pay

agreements were to be executed in mid-December" [Doc. 1 at 18-19 ¶ 39]. Plaintiffs contend that based on actual financial information from 2018 [see Doc. 1-13], none of these statements were true [Doc. 1 at 18-19 ¶ 39].

Plaintiff filed the instant lawsuit on December 7, 2019, claiming that Defendants violated federal security laws under § 10(b) of the Security Exchanges Act (the "Securities Act") (15 U.S.C. § 78j(b)), Rule 10b-5 thereunder (17 C.F.R. § 240.10b-5), and § 17(a) of the Securities Act (15 U.S.C. § 77q(a)). Plaintiff also alleges that Defendant Sionic committed registration violations prohibited by §§ 5(a) and 5(c) of the Securities Act (15 U.S.C. §§ 77e(a), 77e(c)). Count I brings a claim against Defendants for Securities Fraud, and Count II brings a claim against Defendants for common law fraud. Plaintiff additionally seeks punitive damages.

**II.  MOTION TO DISMISS**

The Court begins with Defendant Sionic's Motion to Dismiss [Docs. 10, 11], as its resolution has the potential to render the remaining motions moot. Defendant Sionic first argues that Plaintiff's complaint fails to state a claim under Federal Rule of Civil Procedure 12(b)(6).

Rule 12(b)(6) permits dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In ruling on a pending motion to dismiss, all of the factual allegations in a plaintiff's complaint must be accepted as true and construed in the light most favorable to plaintiff. Young Apartments, Inc. v. Town of Jupiter, Fla., 529 F.3d 1027, 1037 (11th Cir. 2008) (citation omitted). To

-10-

survive a motion to dismiss "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (citation and internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u>

The Rule 12(b)(6) standard "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" of the claim. <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 556 (2007). It is not necessary for a complaint to set out all the facts in detail, but a plaintiff has to at least allege "enough factual matter (taken as true) to suggest" the existence of the required elements of the claim. <u>Id.</u>; <u>see also</u> <u>Watts v. Fla. Int'l Univ.</u>, 495 F.3d 1289, 1296 (11th Cir. 2007).

The elements of a § 10(b) or Rule 10b-5 cause of action are: "(1) the defendant made a false statement or omission of material fact (2) with scienter (3) upon which the plaintiff justifiably relied (4) that proximately caused the plaintiff's damages." <u>Bruschi v. Brown</u>, 876 F.2d 1526, 1528 (11th Cir. 1989); <u>see also</u> <u>Robbins v. Kroger Props., Inc.</u>, 116 F.3d 1441, 1447 (11th Cir. 1997); <u>Gochnauer v. A.G. Edwards & Sons, Inc.</u>, 810 F.2d 1042, 1046 (11th Cir. 1987). Therefore, to survive a motion to dismiss, Plaintiff's complaint must sufficiently plead each of these elements. The Court addresses each element in turn.

-11-

**A.   A Misstatement or Omission**

Defendant Sionic first argues that Plaintiff failed to adequately plead that Defendants made a false statement or omission of material fact. Ordinarily a complaint is adequately pleaded if it meets Rule 8(a)(2)'s requirement of a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); Mizzaro v. Home Depot, Inc., 544 F.3d 1230, 1237 (11th Cir. 2008). However, securities fraud claims are also subject to Rule 9(b)'s heightened pleading requirements, as modified by the Private Securities Litigation Reform Act ("PSLRA"). Mizzaro, 544 F.3d at 1237. Rule 9(b) provides that "the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b); see also FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1296 (11th Cir. 2011). "The particularity rule serves an important purpose in fraud actions by alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior." Durham v. Bus. Mgmt. Assocs., 847 F.2d 1505, 1511 (11th Cir. 1988) (internal quotation marks and citation omitted); see also Ziemba v. Cascade Int'l Inc., 256 F.3d 1194, 1203 (2001). The "[f]ailure to satisfy Rule 9(b) is a ground for dismissal of a complaint." FindWhat, 658 F.3d at 1296 (citing Corsello v. Lincare, Inc., 428 F.3d 1008, 1012 (11th Cir. 2005) (per curiam)).

In 1995, "[a]s a check against abusive litigation by private parties," Tellabs, Inc. v. Makor Issues & Rights, Ltd.,

-12-

551 U.S. 308, 313 (2007), Congress enacted 15 U.S.C. § 78u-4, known as PSLRA.  _FindWhat_, 658 F.3d at 1296.  Among other changes, the PSLRA slightly altered 9(b)'s particularity requirement by mandating that a securities fraud complaint specify:

> (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.

_Brooks v. Blue Cross & Blue Shield of Fla., Inc.,_ 116 F.3d 1364, 1371 (11th Cir. 1997) (internal quotation marks and citation omitted); _see also_ 15 U.S.C. § 78u-4(b)(1)(B); _FindWhat_, 658 F.3d at 1296.

Defendant Sionic first argues that Plaintiff failed to plead the precise misrepresentations purportedly made and why they were misleading.  The Court disagrees.  Plaintiff's complaint clearly delineates each statement Plaintiff contends was misleading and why it was misleading [_see_ Section I, _supra_ at 6-10].  Defendant Sionic next attempts to argue that Plaintiff misconstrued fragmented quotes to fabricate the appearance of a misrepresentation.  However, this argument gets to the merits of Plaintiff's claim.  At the motion to dismiss stage, and in reading Plaintiff's complaint in a light most favorable to it, the Court finds that Plaintiff sufficiently pleaded with particularity the alleged misrepresentations made and how they were misleading.

-13-

The complaint likewise specifies which documents contained the misleading statements and when Defendants disseminated those documents, thereby satisfying the requirement that Plaintiff plead the time and place of each statement. The complaint also clearly avers what Plaintiff contends Defendants obtained as a result of making those statements: Plaintiff's investment. The Court therefore finds that Plaintiff sufficiently pleaded with particularity the first element of a securities fraud claim.

**B.   Scienter**

Defendant Sionic next argues that Plaintiff's complaint failed to adequately plead the second element of a securities fraud claim: scienter. As with the first element, the PSLRA also raised the standard for pleading scienter. <u>Mizzaro</u>, 544 F.3d at 1239. Specifically, in any securities fraud action,

> in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u-4(b)(2)(A); <u>Mizzaro</u>, 544 F.3d at 1238. Therefore, a claimant in a securities fraud action must plead the requisite scienter element with particularity. <u>Mizzaro</u>, F.3d at 1238.

To satisfy the scienter element, Defendant Sionic must have acted with either "intent to deceive, manipulate, or defraud" or "severe recklessness." <u>Mizzaro</u>, 544 F.3d at 1238 (quoting <u>Bryant v. Avado Brands, Inc.</u>, 187 F.3d 1271, 1282 (11th Cir. 1999)) (internal quotation marks omitted). The United States

-14-

Court of Appeals for the Eleventh Circuit has described "severe recklessness" as

> those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care and that present a danger of misleading buyers or sellings which is either known to the defendant or is so obvious that the defendant must have been aware of it.

Id. (quoting Bryant, 187 F.3d at 1282 n.18).   Therefore, to survive a motion to dismiss, Plaintiff must plead with particularity facts giving rise to a strong inference that Defendants either intended to defraud investors or were severely reckless when they made the allegedly false or incomplete statements.   See id.

To determine whether scienter is well pleaded, the Court follows a three-step approach: "(1) it accepts as true all allegations in the complaint; (2) it considers the complaint holistically along with other sources ordinarily explained in ruling on a Rule 12(b)(6) motion to dismiss; and (3) it considers plausible opposing inferences." Damian v. Montgomery Cty. Bankshares, Inc., 981 F. Supp. 2d 1368, 1380-81 (N.D. Ga. 2013) (citing Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322-23 (2007)).   In short, the Court must ask: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" Tellabs, 551 U.S. at 326; see also Mizzaro, 544 F.3d at 1239 (contrasting this inquiry with the summary judgment standard which asks whether reasonable jurors could find that the plaintiff is entitled to a verdict).

-15-

The Court finds that Plaintiff has pleaded facts with particularity that give rise to a strong inference that Defendants were severely reckless.  According to Plaintiff's complaint, Defendants represented Sionic as having working relationships with a number of companies with which it had no formal agreements or contracts.  Defendants represented Sionic as having millions of consumers when in fact it had only 1,200. Defendants represented Sionic as having $18.7 million funded, when in fact it did not.  Defendant is correct that a number of statements Plaintiff references as "misrepresentations" are simply projections that did not come to fruition.[2]  However, when viewed collectively, Plaintiff's allegations are more than enough to suggest that Defendants acted with, at the very least, severe recklessness when providing Plaintiff with false statements in an attempt to induce Plaintiff to invest.

## C.   Justifiable Reliance

Next, Defendant Sionic argues that Plaintiff could not have justifiably relied on any of Defendants' purported misrepresentations.  For a federal securities claim, justifiable reliance means that a plaintiff "reasonably relied" on the specific alleged misstatement.  In re Infocure Sec. Litig., 210 F. Supp. 2d 1331, 1349 (N.D. Ga. 2002).  The Eleventh Circuit has explained justifiable reliance as follows:

---

[2]For example, Plaintiff contends the exponential growth projected by Defendant Sionic of $274,317,184 in sales in 2018 and $1,395,166,306 in sales in 2019 was not possible because Sionic had not actually formalized agreements with any of the strategic partners and did not have the technology or capacity to support these projections [Doc. 1 at 15 ¶ 34].

> A showing of Plaintiff['s] reliance on the misrepresented or omitted information is necessary to satisfy the fourth element of a Rule 10b-5 cause of action. This Circuit requires "reasonable reliance" upon the material misrepresentations, a test of subjective reliance tempered by the requirement of "due diligence" on the part of the plaintiff. Not only must an individual actually rely on the information provided, this reliance must be "justifiable," i.e., with the exercise of reasonable diligence one still could not have discovered the truth behind the fraudulent omission or misrepresentation.

Gochnauer, 810 F.2d at 1047.

The Court considers a number of factors in determining whether there was justifiable reliance:

> (1) the sophistication and expertise of the plaintiff in financial and security matters; (2) the existence of long standing business or personal relationships between the plaintiff and the defendant; (3) the plaintiff's access to relevant information; (4) the existence of a fiduciary relationship owed by the defendant to the plaintiff; (5) concealment of fraud by the defendant; (6) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and (8) [sic] the generality or specificity of the misrepresentations.

Bruschi v. Brown, 876 F.2d 1526, 1529 (11th Cir. 1989); see also In re Infocure, 210 F. Supp. 2d at 1349-50.

Defendant Sionic argues that as a Registered Investment Advisor with a half billion dollars under management and experience in numerous private equity deals, Plaintiff is a sophisticated investor. Defendant Sionic therefore contends that Plaintiff had the sophistication and resources to understand the information it received from Sionic and to know what to request. According to Defendant Sionic, a reasonably diligent investor in Plaintiff's position would have discovered the amount of Sionic's subscribers, whether income was being generated from the partners with whom Sionic claimed it worked,

-17-

and whether Sionic had existing contracts or agreements with those partners.  Defendant Sionic also contends it cautioned Plaintiff that Sionic was high risk and early stage and might be unable to implement its business plan.

The Court finds Defendant Sionic's argument premature. Even if Plaintiff is a sophisticated investor, and even if Plaintiff could have or should have done more during due diligence, questions of due diligence often must be resolved by the trier of fact.  TSG Water Res., Inc. v. D'Alba & Donovan Certified Public Accountants, P.C., 260 F. App'x 191, 200 (11th Cir. 2007); see also Damian, 255 F. Supp. 3d at 1282 ("[T]he question of reasonable reliance is typically a fact question, and therefore failure to sufficiently plead reliance is rarely a basis for dismissing a claim.").  Here, there is not enough evidence before the Court to rule as a matter of law that Plaintiff could have done more during due diligence, thereby making its reliance on Defendants' purported misrepresentations unjustified.  The Court therefore declines to address Defendant Sionic's justifiable reliance argument at the motion to dismiss stage.

### D.   Proximate Causation

Defendant Sionic next argues that Plaintiff has failed to successfully plead the nexus between Defendants' statements and Plaintiff's decision to purchase securities.  The Court finds this argument likewise without merit.  Plaintiff pleaded a number of times throughout the complaint that Defendants' allegedly fraudulent statements "were relied upon by [Plaintiff] in making its investment decisions" [see Doc. 1 at 12 ¶ 34, 17

-18-

¶ 35, 19 ¶ 40, 21 ¶ 41]. Plaintiff also pleaded that "[t]he misrepresentations and omissions detailed [throughout the complaint] were 'material' to [Plaintiff] and used by [Plaintiff] in making its decision to invest $1.6 million in Sionic Mobile in exchange for 800,000 shares of common stock" [Doc. 1 at 26 ¶ 44]. The Court therefore finds that Plaintiff sufficiently pleaded proximate causation.

### E.   Damages

Defendant Sionic makes two arguments related to damages. First, Defendant Sionic argues that Plaintiff has not articulated actionable damages. However, the complaint expressly asserts damages "in an amount not less than $1.6 million[,]" the amount Plaintiff claims to have invested in Defendant Sionic [Doc. 1 at 27 ¶ 47]. The Court therefore finds this argument without merit.

Defendant Sionic also argues that Plaintiff's punitive damages claim should be dismissed because punitive damages are not recoverable for a securities fraud claim. Defendant is correct that security fraud cases are limited to actual damages. See Pelletier v. Stuart-James Co., 863 F.2d 1550, 1557 (11th Cir. 1989) (noting security fraud cases are limited to actual damages, which does not include punitive damages); Woods v. Barnett Bank of Ft. Lauderdale, 765 F.2d 1004, 1013-13 (11th Cir. 1985) ("Punitive damages are not available in a 10b-5 action."). However, Plaintiff's request for punitive damages is derivative not of its 10b-5 claim, but of its state law fraud claim, which does allow the recovery of punitive damages. See O.C.G.A. § 51-12-5.1(b) ("Punitive damages may be awarded only

-19-

in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences.").

It is true that punitive damages are not recoverable if the underlying state law fraud claim fails. See Pelletier, 863 F.2d at 1559; Curry v. TD Ameritrade, Inc., CIVIL ACTION NO. 1:14-CV-1361-LMM, 2015 WL 11251449, at *15 ("Under Georgia law, 'a plaintiff cannot recover punitive damages when the underlying tort claim fails.'") (citing Lewis v. Meredith Corp., 293 Ga. App. 747, 749 (2009)). Like Plaintiff's claim under Rule 10b-5, fraud under Georgia law has five elements: "a false representation by a defendant, scienter, intention to induce the plaintiff to act or refrain from acting, justifiable reliance by plaintiff, and damage to plaintiff." Insight Tech., Inc. v. Freightcheck, 280 Ga. App. 19, 28 (2006); see also Tharp v. Vesta Holdings I, LLC, 276 Ga. App. 901, 904-05 (2005). For the reasons provided above, Plaintiff has sufficiently pleaded the elements of its state law fraud claim. Plaintiff's punitive damages claim is therefore not subject to dismissal at this time.

**F.    Statute of Limitations**

Defendant Sionic last argues that Plaintiff's securities fraud claim is time barred and therefore should be dismissed. Securities fraud claims under Section 10(b) and Rule 10b-5 are subject to a two-year statute of limitations, 28 U.S.C. § 1658(b), which begins to run when the plaintiff discovered, or

-20-

reasonably could have discovered, the facts constituting the violation--whichever occurs first. <u>Merck & Co. v. Reynolds</u>, 559 U.S. 633, 637 (2010); <u>Monroe Cty. Emps. Ret. Sys. v. S. Co.</u>, CIVIL ACTION FILE NO. 1:17-CV-241-MHC, 2018 WL 1558577, at * 4 (N.D. Ga. Mar. 29, 2018). Defendant Sionic argues that Plaintiff had sufficient information to plead the elements of a securities fraud claim on December 5, 2017, the date Plaintiff executed the Joinder Agreement and agreed to invest in Defendant Sionic. Sionic contends that Plaintiff had access to documents, including financial statements for 2015, 2016, 2017 and the October 2017 pro forma, that would have put a reasonably diligent plaintiff on notice of a securities violation. Therefore, according to Defendant Sionic, the statute of limitations ran on December 5, 2019. Because Plaintiff did not file this lawsuit until December 7, 2019, Defendant Sionic argues that Plaintiff's securities fraud claim is untimely.

Like Defendant Sionic's justifiable reliance argument, its statute of limitations argument is premature. Whether Plaintiff was reasonable in its investigation during due diligence is a question of fact, and the parties must engage in discovery for either the Court, at summary judgment, or the jury, at trial, to determine the reasonableness of Plaintiff's efforts. At this stage of litigation, the Court simply does not have enough before it to determine when a reasonable plaintiff would have discovered the alleged security violation in this matter and therefore when the statute of limitations began to run. For these reasons, the Court DENIES Defendant Sionic's Motion to

-21-

Dismiss [Docs. 10, 11].  Defendant Sionic may renew its statute-of-limitations argument at summary judgment.

## III. Defendant Sionic's Motion to Disqualify

Defendant Sionic filed a Motion to Disqualify on January 30, 2020 [Doc. 9], asking the Court to disqualify Plaintiff's counsel of record, Busch, Slipakoff, Mills & Slomka, LLC ("Busch Slipakoff"), pursuant to Georgia Rules of Professional Conduct 1.7, 1.9, 1.10 and 3.7. Adam Slipakoff ("Slipakoff"), a named partner of Busch Slipakoff, presently serves as Busch Slipakoff's Managing Partner, Mergers & Acquisitions Chair, and Corporate Securities Chair.  According to Defendant Sionic, Slipakoff was also the founding partner and an active member of Slipakoff, LLP, in which capacity he allegedly served as Sionic's outside general counsel for 2015 and 2016.

Plaintiff filed a response in opposition on February 13, 2020 [Doc. 15].  Plaintiff argues that Slipakoff's prior engagement with Sionic was limited to "a single, 20-minute telephone call two (2) years prior to [Plaintiff's] investment of Sionic Common Stock in December 2017" [Doc. 15 at 1-2]. Plaintiff contends Sionic did not disclose any confidential information to Slipakoff during this engagement and that none of the legal matters discussed during this engagement are related to the instant matter.  According to Plaintiff, both Defendant Sionic and Plaintiff were represented by separate legal counsel, unrelated to Slipakoff, at the time the transaction giving rise to this lawsuit was finalized.

-22-

In the United States Court of Appeals for the Eleventh Circuit, the test for disqualification is a two-step inquiry. The claimant must prove: (1) "that it once enjoyed an attorney-client relationship with the opposing lawyer;" and (2) that "the matters embraced within the pending suit are *substantially related* to the matters or cause of action wherein the attorney previously represented it." Cox v. Am. Cast Iron Pipe Co., 847 F.2d 725, 728 (11th Cir. 1988) (internal marks and citation omitted); see also Dodson v Floyd, 539 F. Supp. 1056, 1060 (N.D. Ga. 1981) (citations omitted) ("[W]here an attorney represents a party in a matter in which the adverse party is that attorney's former client, the attorney will be disqualified if the subject matter of the two representations are 'substantially related.'") (citations omitted).   The Court addresses each element in turn.

**A.   Attorney-Client Relationship**

To meet its burden of establishing an attorney-client relationship between Slipakoff and Defendant Sionic, Defendant attached to its motion an Attorney-Client Representation Agreement ("the Agreement"). The Agreement states, in pertinent part:

> We are pleased that you have chosen Slipakoff LLP to represent you.   This letter will confirm our understanding that you have engaged this firm and will describe the basis on which our firm will provide legal services to you.   We look forward to a successful and satisfying attorney-client relationship. . . . Again, we thank you for the opportunity to represent [Sionic].   Please sign and date this engagement letter and return it to my attention, retaining the original for your files.

-23-

[Doc. 9-2 at 28-30].  The letter addresses, among other things, Slipakoff's fees, expenses, and its procedures regarding conflict of interests or withdrawal from representation.  The Court therefore finds that Defendant Sionic met its burden of establishing an attorney-client relationship.

**B.   "Substantially Related" Matter**

Turning to the second element, "the determination of whether there is a substantial relationship turns on the possibility, or appearance thereof, that confidential information might have been given to the attorney in relation to the subsequent matter in which disqualification is sought." Dodson, 539 F. Supp. at 1060; see also State Farm Fire & Cas. Co. v. Muller, CIVIL ACTION NO. 2:04-CV-0193-RWS, 2005 WL 8156148, at *2 (N.D. Ga. Aug. 15, 2005).  This typically requires the following analysis:

> Initially, the Court must make a factual reconstruction of the scope of the prior legal representation.  Second it must be determined whether it is reasonable to infer that the confidential information allegedly given would have been given to a lawyer representing a client in those matters. Finally, it must be determined whether the information is relevant to the issues raised in the litigation pending against the former client.  The Court must place the burden of proving that the present and prior representations are substantially related on the party seeking disqualification and the focus of the Court's inquiry must be on the precise nature of the relationship between the present and former representations.

Dodson, 529 F. Supp. at 1061; see also Muller, 2005 WL 8156148, at *2.

The parties present very different accounts of Slipakoff's relationship with Defendant Sionic.  According to Defendant Sionic, it became involved with Slipakoff on December 4, 2015,

-24-

when Slipakoff was introduced as potential counsel [Doc. 9-1 at 3].   This meeting allegedly resulted in e-mail correspondence and an in-person meeting in which Slipakoff "promoted his ability to represent Sionic in regard to investments and securities law, in addition to various merger and acquisition opportunities" [Doc. 9-1 at 4].   Defendant Sionic claims that on December 8, 2015, Slipakoff and Sionic entered into an Attorney-Client Representation agreement, under which Slipakoff confirmed "we have been engaged to represent Sionic Mobile Corporation . . . in regard to various corporate matters" [Doc. 9-1 at 4-5]. Defendant Sionic was therefore under the impression that Slipakoff was Sionic's outside general counsel.

The next day, on December 9, 2015, Defendant Sionic alleges to have shared significant sensitive confidential information with Slipakoff, including information on certain pending business transactions, proposed uses for capital, potential target investors and funding sources, business plans, and draft promotional and solicitation materials [Doc. 9-1 at 5].   Shortly thereafter, and at Slipakoff's request, Sionic transmitted warrants for Slipakoff to execute, which upon exercise would have entitled Slipakoff to become a direct holder of Sionic stock [Doc. 9-1 at 5].   On December 11, 2015, Slipakoff e-mailed Sionic to confirm he had signed the warrants.   In the same e-mail, Slipakoff offered to introduce Sionic to a high net worth friend he thought would make an appropriate investor [Doc. 9-1 at 6].   To assist with this introduction, Slipakoff requested various sensitive internal corporate information, such as

-25-

Sionic's Private Placement Memorandum, pro forma spreadsheets--
including 2016's--and historical financials [Doc. 9-1 at 6].

Slipakoff ultimately failed to fund the warrants, however
Slipakoff nonetheless responded that "he was incredibly thankful
that his failure to fund the Warrants had not tainted Herman's
view of Slipakoff or his firm's value" [Doc. 9-1 at 6].
Slipakoff assured Defendants that he would continue to "be a
vocal evangelist for Sionic" and that he had several private
equity firms and various high net worth investors whom he
thought would be good prospective investors in Defendant Sionic.
On January 6, 2016, Slipakoff offered to introduce Sionic to a
potential partner [Doc. 9-1 at 7].  In response, Herman sent
Slipakoff an overview of Sionic's platform, asking Slipakoff to
review the document [Doc. 9-1 at 7].  Later that same day,
Slipakoff made the introduction.

On July 12, 2016, Slipakoff requested, and Sionic provided,
an updated business plan and financials.  Defendant Sionic
contends that it subsequently ceased sending Slipakoff legal
work on or about August 2016, citing a failure to provide the
level of responsiveness and sophistication that Sionic was
assured.  Approximately fourteen months later, Plaintiff became
an investor in Defendant Sionic.  Defendant Sionic contends that
in working together, Slipakoff reviewed financials, promotional
and investment materials, and other documents that were either
shared with Slipakoff incident to representation or upon which
Slipakoff's advice was requested.  Defendant Sionic contends
that at no point did Slipakoff seek or provide a waiver of
conflict.

-26-

Plaintiff contends that Slipakoff's initial introduction to Defendant Sionic began not as potential counsel, but with Sionic's solicitation of Slipakoff as a potential investor in 2015 [Doc. 15 at 3]. According to Plaintiff, Defendant Sionic solicited Slipakoff on a number of occasions between October 19, 2015 and December 8, 2015 for the express purpose of inducing Slipakoff to purchase Sionic's Series B Preferred Stock and Warrants [Doc. 15 at 3]. Plaintiff therefore contends that the discussions between Sionic and Slipakoff revolved not around representation, but around bringing Slipakoff in as a prospective investor [Doc. 15 at 5].

Plaintiff further argues that Sionic never sent Slipakoff any confidential information in furtherance of an attorney-client relationship. To the contrary, all of the investment documents provided to Slipakoff were prepared by Sionic or its attorneys to induce Slipakoff to invest in Sionic. Despite Defendant Sionic's arguments to the contrary, Plaintiff contends that Slipakoff never reviewed any financials, promotional materials, or other documents; rather, according to Plaintiff, Slipakoff's "review" of such documents was limited solely to his potential investment in Sionic's Series B Preferred Stock offering. Plaintiff therefore argues that Defendant Sionic's assertion that Slipakoff provided legal advice is entirely false and contradicted by direct evidence.

The Court turns to a review of the documents provided by the parties. Defendant Sionic first became aware of Slipakoff on December 1, 2015 [Doc. 9-2 at 2 ¶ 4], in regard to a donation of Sionic stock that Patrick Gahan ("Gahan"), a Sionic

-27-

stockholder and Board member, wanted to make to various foundations and charities [Doc. 9-2 at 2 ¶ 4].   To help facilitate the donation, Slipakoff LLP, as Gahan's lawyers, requested a division of an existing Sionic stock certificate into multiple smaller certificates [Doc. 9-2 at 2 ¶ 5].   On December 4, 2015, Gahan introduced Slipakoff to Sionic, which resulted in e-mail correspondence between Herman, Gahan, and Slipakoff.   Gahan e-mailed Herman: "Here is a quick preview of Adam Slipakoff's value add . . . I asked him to share five intros he could make.  He definitely has more.  I think he is a good strategic partner to consider for the warrants" [Doc. 9-2 at 20].

Herman then met with Slipakoff at an in-person meeting on December 7, 2015 [Doc. at 9-2 at 3].[3]  That same day, Slipakoff e-mailed Herman for "a copy of the PPM, pro formas, warrants, etc." to evaluate after their meeting [Doc. 15 at 5; see also Doc. 9-2 at 19].  On December 8, 2015, Herman e-mailed someone by the name of Spencer White: "We are going to engage Adam Slipakoff's firm for gen. corporate counsel.  Kevin Kirby has done a good job for us, but Adam will bring a greater level of urgency and priority.  I should have an engagement letter from him by Friday" [Doc. 9-2 at 25].  Herman and Slipakoff signed the engagement letter that same day [Doc. 9-2 at 28-30].

---

[3]The parties disagree as to the location of the meeting. Plaintiff contends the meeting took place at Sionic's office whereas Defendant Sionic contends the meeting took place at Slipakoff's office [Doc. 9-1 at 3; Doc. 9-2 at 3 ¶ 6; Doc. 15 at 5].

-28-

On December 11, 2015, Slipakoff asked for, and received, a copy of Sionic's non-disclosure agreement and an updated pro forma [Doc. 9-2 at 35].   On December 14, 2015, Herman and Slipakoff exchanged a number of e-mails regarding Slipakoff's warrants and wiring the funds for said warrants [Doc. 9-2 at 38].   In this exchange, Slipakoff asked for a copy of Sionic's historical financials, specifically 2014 and 2015 year to date [Doc. 9-2 at 37].   Herman responded that "[a]ll historical financials are published in the Investor Center along with copy of Series B PPM and 2016 quarterly pro forms" [Doc. 9-2 at 37].

On January 6, 2016, Slipakoff e-mailed Gahan and Herman asking for any marketing materials that explain Sionic's credit card opportunity [Doc. 9-2 at 46].   Herman sent Adam a 2-page overview in response [Doc. 9-2 at 46].   On July 12, 2016, Slipakoff e-mailed Herman, asking for the latest financials and a business plan [Doc. 9-2 at 53].

The Court finds that based on the evidence before it, Defendant Sionic has not met its burden of proving that the present and prior representations are substantially related. The e-mail exchanges cited are limited, and focus almost entirely on either public information--such as Sionic's financials--or information any potential investor may obtain-- such as the marketing materials or the pro formas. Even if such information is related to the instant matter, Defendant Sionic fails to articulate why it is reasonable to infer that this information, and any other information allegedly given, was confidential. Based on the nature of the documents and the fact that they are the same types of documents shared with Plaintiff,

-29-

it is more reasonable to infer that they were shared with
Slipakoff in his capacity as a potential investor and not as
Sionic's counsel.   Although Defendant Sionic makes the bare
assertion that Slipakoff reviewed certain documents, Defendant
fails to produce any evidence supporting this contention.   The
Court therefore DENIES Defendant Sionic's Motion to Disqualify
[Doc. 9].

**IV.   MOTION TO EXCEED PAGE LIMITATIONS**

On February 5, 2020, Defendant Sionic filed a Motion to
Exceed Page Limitations [Doc. 14], asking the Court to extend
the twenty-five page limit applicable to its Memorandum in
Support of its Motion to Dismiss by one page.   Noting the lack
of objection thereto, the Court GRANTS Defendant Sionic's Motion
to Exceed Page Limitations.

**V.   MOTION TO LIFT SEAL AND FOR LEAVE TO FILE ADDITIONAL REPLY
BRIEF IN SUPPORT OF ITS MOTION TO DISQUALIFY BUSCH,
SLIPAKOFF, MILLS & SLOMKA, LLC AS COUNSEL OF RECORD**

On February 13, 2020, Plaintiff filed a Motion for Leave to
File Under Seal Plaintiff's Memorandum of Law in Opposition to
Defendant Sionic Mobile Corporation's Motion to Disqualify Busch
Slipakoff Mills and Slomka LLC as Counsel of Record [Doc. 17].
Plaintiff asked the Court to file its response under seal to the
extent it may include communications protected by the attorney-
client privilege.   The Court granted Plaintiff' motion on
February 19, 2020 [Doc. 20].   On February 27, 2020, Defendant
Sionic filed a Motion to Lift Seal and for Leave to File
Additional Reply Brief in Support of its Motion to Disqualify
Slipakoff [Doc. 25].   Defendant Sionic argues that because a
large portion of Plaintiff's response brief is redacted,

-30-

Defendant has not received notice of the evidence upon which Plaintiff relies in its opposition to Sionic's Motion to Disqualify. Defendant Sionic therefore asks the Court to lift the seal, allow Sionic to review the full, unredacted version of Plaintiff's response in opposition, and grant Sionic leave to file an additional reply brief within fourteen days. Because the Court finds that Defendant Sionic did not meet its burden of establishing that Slipakoff received confidential information related to the instant matter, the Court DENIES Defendant Sionic's Motion to Lift Seal and for Leave to File Additional Reply Brief in Support of its Motion to Disqualify Slipakoff [Doc. 25].

## VI.  REQUEST FOR HEARING ON MOTION TO DISMISS

On June 9, 2020, Plaintiff filed a Motion for a Hearing [Doc. 32], stating that an oral argument is desired and would assist the Court in reaching a decision on Defendant Sionic's Motion to Dismiss. Because the Court DENIES Defendant Sionic's Motion to Dismiss, the Court likewise DENIES Plaintiff's.

## VII. CONCLUSION

For the reasons provided above, the Court DENIES Defendant Sionic's Motion to Disqualify [Doc. 9], Defendant Sionic's Motion to Dismiss [Docs. 10, 11], Defendant Sionic's Motion to Lift Seal and for Leave to File Additional Reply Brief in Support of its Motion to Disqualify [Doc. 25], and Plaintiff's Motion for a Hearing [Doc. 32]. The Court GRANTS Defendant Sionic's Motion to Exceed Page Limitations [Doc. 14].

SO ORDERED, this ___1___ day of September, 2020.

ORINDA D. EVANS
UNITED STATES DISTRICT JUDGE