# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| BERKELEY VENTURES II, LLC, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION FILE |
| | : | |
| vs. | : | |
| | : | NO._____ |
| SIONIC MOBILE CORPORATION, | : | |
| RONALD D. HERMAN, and PATRICK | : | |
| GAHAN, | : | |
| | : | |
| Defendants. | : | |
| ―――――――――――――――――― | : | |

## AMENDED VERIFIED COMPLAINT FOR DAMAGES

NOW COMES Plaintiff BERKELEY VENTURES II, LLC (hereafter

"Plaintiff") and files this Verified Complaint for Damages against Defendants

SIONIC MOBILE CORPORATION ("Sionic Mobile"), RONALD

D. HERMAN ("Herman") and PATRICK GAHAN ("Gahan") (collectively

"Defendants") showing the Court as follows:

## PARTIES

### *Plaintiff*

1.

Plaintiff is a Mississippi limited liability company with its principal place of

business located at 3500 Parkway Lane, Suite 430, Norcross, GA 30092. Plaintiff

is registered as a foreign entity to conduct business in Georgia and is managed by

PEN Equity II, LLC, a Georgia limited liability company. Plaintiff is a small, private equity fund affiliated with Berkeley Capital Partners, LLC, a licensed Registered Investment Advisor registered with the Securities and Exchange Commission and the State of Georgia

<u>*Defendants*</u>

2.

Defendant Sionic Mobile is a Georgia for profit corporation with its principal place of business located at 1230 Peachtree Street NE, Suite 3700, Atlanta, GA, 30309. Sionic Mobile may be served with process via its registered agent, Ronald Herman, at 155 Little John Trail NE, Atlanta, GA, 30309.

3.

Defendant Herman is an individual resident of the State of Georgia who may be served with process at his personal residence, 155 Little John Trail NE, Atlanta, GA, 30309, or wherever he may be located.

4.

Defendant Patrick Gahan is a individual resident of the State of Georgia who may be served with process at his personal residence, 3660 Somerset Drive, SW Marietta, Georgia 30064.  Mr. Gahan at all times relevant was a Director of and Promoter for Sionic.

2

## JURISDICTION AND VENUE

### 5.

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 as it involves claims under Section 10b-5 of the Securities Exchange Act of 1934, as amended (the "Exchange Act").

### 6.

This Court has personal jurisdiction over Defendants as they reside and conduct business within the State of Georgia and within this federal judicial district.

### 7.

Venue is proper in this Court pursuant to 28 U.S.C. § 1391 as the acts and omissions set forth herein occurred within this federal judicial district and Defendants reside within this federal judicial district.

## NATURE OF ACTION

### 8.

Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Exchange Act.

### 9.

In addition to fraud claims for violations of § 10(b) of the Exchange Act (15

3

U.S.C. § 78j(b)), Rule 10b-5 thereunder (17 C.F.R. § 240.10b-5), and § 17(a) of

the Securities Act (15 U.S.C. § 77q(a)), Sionic Mobile committed registration

violations prohibited by §§ 5(a) and 5(c) of the Securities Act (15 U.S.C. §§

77e(a), 77e(c)), and aided and abetted such violations.

## STATEMENT OF FACTS

### 10.

Sionic Mobile was formed as a Georgia corporation in January 2010 by its

founder, Defendant Herman. The company provides mobile marketing and loyalty

rewards services to merchants and consumers.

### 11.

Since its formation, Sionic Mobile, Defendant Herman and certain members

of its board of directors, (including Mr. Gahan)(hereafter "the Board") have

systematically attempted to raise capital from a variety of investors claiming

Sionic Mobile was on the "cusp" of experiencing exponential growth, sustained

profits and immediate acquisition resulting in financial security for investors that

take advantage of this "once in a lifetime" investment opportunity.

### 12.

Sionic Mobile, Defendants Herman, Gahan and the Board used a

deceptive sales strategy consisting of artificial deadlines, shortened due

diligence periods, fabricated scarcities of shares, grossly inflated projections,

false and misleadingsales literature, "in person" sales meetings, alleged

partnerships, and overstated technology capabilities.

13.

Sionic Mobile has enjoyed a level of success in raising capital and boasts

that it has raised more than $18 million since its inception in 2010. However,

according to Form D Notices of Exempt Offering of Securities filed with the SEC

and various states, Sionic Mobile had only raised: (i) $1,290,000 out of $2,500,000

offered on June 6, 2011 and (ii) $0 out of $3,000,000 offered on September 25,

2013.  These Form D Notices are attached hereto as Exhibit "**A**."

14.

On various occasions between 2015 and 2017, Sionic Mobile even raised

capital by facilitating sales of "soon to be expiring" unexercised employee

warrants to prospective investors. In this scheme, investors were told that Sionic

Mobile's stock was worth $30.00 per share yet certain Sionic Mobile employees

were willing to transfer some or all of their personal warrants (options to purchase

Sionic Mobile shares at a $2.00 exercise price) to outside investors because the

employees did not have the money to exercise them themselves before they

expired.This "once-in-a-lifetime" opportunity was pushed to more than a dozen

prospective investors over a period of at least two (2) years, including by Mr.

Gahan, even though Gahan knew the opportunity was not based on fact.

15.

Despite its fund-raising efforts, Sionic Mobile continued to underperform, failed to meet any of the promised growth metrics, failed to consummate promised partnership opportunities, failed to generate significant revenue, failed to complete its technology platforms and continued to operate with substantial losses exceeding millions per year.  In 2017 alone, Sionic Mobile lost a total of $4.8 million.

16.

As the annual losses began adding up, Sionic Mobile and Defendant Herman doubled their efforts to find new investors to cover the operating shortfalls. At the same time, however, many of Sionic Mobile's existing investors demanded their promised returns making it difficult to raise new capital.

*Exit Strategy for Existing Investors*

17.

In an effort to keep existing investors from lodging formal complaints or filing suits, Sionic Mobile, Defendant Herman and particularly, Defendant Ghaan, attempted to pacify investors that became disgruntled with Sionic Mobile's failures and the false promises of exponential growth.  Specifically, the enticement of a transfer of shares at inflate values to Mr. Gahan's charity was a vehicle to buy the silence of Sionic investors.

18.

Prior to Plaintiff's investment, Gahan wrongfully and fraudulently donated an extremely  large number shares to a charity in which he is the executive director ("Enduring Hearts, Inc.") at inflated share prices to generate charitable tax deductions. Upon information and belief, Herman donated a similarly large amount of shares in the same scheme right around the time of Plaintiff's investment.  The donation of overinflated shares of Sionic had the practical impact of defrauding the charity started, controlled and run by Gahan.

19.

This arrangement enabled Defendants to continue raising capital for Sionic Mobile without publicizing the company's losses and was aided by artificial charitable valuations provided by  Sionic and/or Herman, Gahan and wrongfully enriched all of them.

20.

Upon information and belief, Defendants failed to disclose these charitable contribution arrangements (to Enduring Hearts) to Plaintiff prior to its investment.

*Plaintiff's Investment in Sionic Mobile*

21.

Plaintiff's Chief Executive Officer, Anthony Palazzo ("Mr. Palazzo"), was introduced to Sionic Mobile and Defendant Herman by Defendant Gahan via

email(the "Introductory Email"). A true and accurate copy of the Introductory

Email is attached hereto as Exhibit "**B**."

22.

Attached to the Introductory Email was an executive summary of Sionic

Mobile dated October 2017 (the "Executive Summary") along with a company fact

sheet dated October 12, 2017 (the "Fact Sheet"). True and accurate copies of the

Executive Summary and Fact Sheet are attached hereto as Exhibits "**C**" and "**D**."

23.

In the Introductory Email, Sionic Mobile, by and through Defendant

Gahan,  encouraged Plaintiff to invest inSionic Mobile at $2.00 per share,

valuing the company at approximately $85 million.  Upon information and

belief, Gahan knew that this valuation was inaccurate and was not possible due

to Sionic's continual need for operating capital.

24.

In the Introductory Email from Sionic board member, Defendant Gahan,

Plaintiff was encouraged to invest in Sionic Mobile quickly by stating "I wanted to

just make it clear that they have a week(s)to close out investors...they could very

well be done raising funds in 10 days" and"this is probably not going to be enough

time for your normal due diligence for your clients to consider, but it might be

something you can get comfortable with quickly for smaller personal investments.

This is my favorite tech company in ourportfolio...I personally did the initial

technology due diligence review 2 years agofor the Series B round."

25.

In response to the Introductory Email, Defendant Herman invited Plaintiff to

meet and visit Sionic Mobile's offices in Atlanta saying "[its] important for me to

disclose current state and step through financial pro formas." Two days later, on

October 27, 2017, Plaintiff joined on a conference call to discuss Sionic Mobile's

history, business plan and its need for capital.

26.

On October 27, 2017, Mr. Palazzo requested Defendant Herman send him

any information on the prospective investment including a private placement

memorandum, cap table, slide presentation and other diligence materials available.

In response, Defendant Herman wrote "our Offering Memorandum is two years

old and of no relevance."  Instead, he provided a cap table showing approximately

38.4 million shares of stock, options and warrants issued and outstanding. A true

and accurate copy of the October 27, 2017 email exchange is attached hereto as

Exhibit "**E**."

27.

Representatives of Plaintiff met with Sionic Mobile at its headquarters in

Atlanta on October 31, 2017. Following this meeting, Mr. Palazzo requested a breakdown of the proposed use of funds and received an email from Sionic Mobile on November 1, 2017 outlining the proposed use of funds for 90 days (the "Use of Funds Email"). A true and accurate copy of the Use of Funds Email is attached hereto as Exhibit "**F**." Plaintiff also received an updated proforma via email showing detailed revenue and projections for each customer (hereafter "Proforma Spreadsheet"). A true and accurate copy of the Proforma Spreadsheet is attached hereto as Exhibit "**G**."

28.

On November 2, 2017, Plaintiff requested and received a schedule of debt from Sionic Mobile showing outstanding notes owed to Defendant Herman and other Board members (hereafter "Debt Schedule").  True and accurate copies of the November 2, 2017 email and accompanying Debt Schedule are attached hereto as Exhibit "**H**."

29.

On November 8, 2017, Defendants sent a number of investment documents to Plaintiff to be signed, including: (i) a Subscription Agreement, (ii) an Investor Questionnaire, (iii) Sionic Mobile's Amended and Restated Shareholder Agreement, (iv) Joinder to the Shareholders' Agreement, and (v) Sionic Mobile's wire instructions (collectively "Investment Documents"). A true and accurate copy

of the November 8, 2017 email is attached hereto as Exhibit "**I**."

30.

On November 20, 2017, Plaintiff received an email from Defendant Herman providing an update of Sionic Mobile's business activities and encouraging Plaintiff to finalize its investment (hereafter "Email Update"). A true and accurate copy of the November 20, 2017 Email Update is attached hereto as Exhibit "**J**."

31.

On December 5, 2017, Plaintiff sent Sionic Mobile signed copies of the Investment Documents and two days later, on December 7, 2017, finalized the transaction by wiring $1,600,000 into Sionic Mobile's bank account for purchase of 800,000 shares of common stock (hereafter "Investment").  A true and accurate copy of the December 7, 2017 email confirming the wire transfer is attached hereto as Exhibit "**K**."

32.

Berkley's due diligence period began on October 25, 2017 with the Introductory Email and was shortened as a result of the false deadlines imposed by Defendants through the investment date of December 7, 2017 (hereafter "Restricted Due Diligence Period').

33.

Almost immediately after accepting Plaintiff's Investment, Defendants

began backtracking on their written promises, guaranteed partnership agreements

and revenue projections.  In an email dated January 19, 2018, a Key Board

Member informed Plaintiff (1) not to expect "a lot of revenue in Q1" despite

promises days earlier of $10 million in Q1 revenue as stated in the Proforma

Spreadsheet and (2) that the key airline relationship projected to onboard

30,000,000 users on January 1, 2018 according to the Executive Summary was not

being pushed so resources could be focused "on other endeavors." A true and

accurate copy of the January 19, 2018 email is attached hereto as Exhibit "**L**."


*Written Misrepresentations*

34.

During the Restricted Due Diligence Period, Defendants provided Plaintiff

with written statements, marketing materials, financial information, emails,

executive summaries, fact sheets, draft contracts and use of proceeds statements as

part of a concerted effort to mislead Plaintiff about Sionic Mobile's financial

position, business opportunities, product development, strategic partnerships,

formalized agreements, share price and growth projections.


35.

The Executive Summary provided by Defendants (*See* Ex. **C**) contained

false and misleading statements that were relied upon by Plaintiff in making its

investment decisions, including the following:

**Page 2**

- *"we connect brick and mortar merchants with millions of consumers"*

  o This was a present tense statement about existing business being conducted by Sionic Mobile. Sionic Mobile was not connecting millions of consumers with merchants in 2017 as shown by subsequent financial information and had only 1,200 subscribers at the time (A true and accurate copy of the 2018 Sionic Mobile financial information is attached hereto as Exhibit "**M.**")

- *"General Motors Partnership" - "we earn 50% of the $20-$40 CPM rate"*

  o This was a present tense statement about the existence of an active partnership between GM and Sionic Mobile in October 2017. Sionic Mobile did not have a partnership or formal agreement with GM in 2017 that allowed for this fee sharing arrangement, a fact known, but not disclosed to Plaintiff, by Defendants.  (*See* Ex. **M**).

<u>**Page 4**</u>

- ***"payment commerce platform" – "we earn ½ to 5% of POS transaction amounts"***

  o This was a present tense statement about the existing technology capabilities of Sionic Mobile's payment commerce platform.  No such commerce platform ever generated sales revenue at these levels as shown by Sionic Mobile's subsequent financial information.  (<u>*See*</u> Ex.  **M**).

<u>**Page 5**</u>

- ***"Loyalty app partners in auto, airline, banking, hotel, mobile phone, insurance and other channels"***

  o This was a present tense statement about existing contracts and partnerships with major corporations. Upon information and belief, no such formal partnerships or agreements existed a fact known, but not disclosed to Plaintiff, by Defendants.

- ***"30,000,000 users on January 1 for Airline 1"***

  o This representation was included as part of the graph describing how and when Sionic Mobile was reaching consumers. It indicated that Sionic Mobile

had finalized one deal with a major airline that would produce 30,000,000 users beginning on January 1, 2018, three weeks after Plaintiff's Investment. Sionic Mobile had no such finalized agreement in place with any airline and did not have the technology or capacity to capture 30,000,000 users in 2017 or any time thereafter.

- **"25,000,000 users on January 1 for Healthcare 1"**
  - o  This representation was included as part of the graph describing how and when Sionic Mobile was reaching customers.  It indicated that Sionic Mobile had finalized one deal with a major healthcare provider that would produce 25,000,000 users beginning on January 1, 2018, three weeks after Plaintiff's Investment. Sionic Mobile had no such finalized agreement in place with any healthcare provider and did not have the technology or capacity to capture 25,000,000 users in 2017 or any time thereafter.

**Page 14**

- ***Exponential growth projections***

    - The exponential growth projected by Sionic Mobile of $374,317,184 in sales in 2018 and $1,395,166,306 in sales in 2019 was not remotely possible as Sionic Mobile had not actually formalized agreements with any of the strategic partners and did not have the technology or capacity to support these projections. Furthermore, these projections showed that Sionic Mobile would be cash flow positive within less than amonth after Berkley's Investment which was inconceivable under the circumstances learned after the fact. In actuality, the 2018 financials published by Sionic Mobile showed that its revenue was $157,727.96 with a loss of $4,856,395.95. Sionic Mobile missed its projection for 2018 revenue (which it confirmed when Plaintiff invested three weeks prior to the end of 2018) by **237,000%.**

**Page 16**

- ***"$18.7 million funded"***

    - Sionic Mobile represented it had already raised $18.7

16

million in capital by October 2017, however, this
number was overstated based on available public
filings in an effort to convince Plaintiff of its
legitimacy.

- ***"12 patents and trademarks"***
  - o While Sionic Mobile did maintain a single patent for
    its loyalty program, it did not have the represented
    total of intellectual property rights.

36.

During the Restricted Due Diligence Period, Defendants presented Plaintiff
with the Fact Sheet.  <u>*See*</u> Ex. **D**.  The Fact Sheet contained the following false and
misleading statements that were relied upon by Plaintiff in making its investment
decision:

- ***"28 full time employees and contractors"***
  - o Upon information and belief, Sionic Mobile did employee a few
    individuals in 2017, but it did not have the represented totalnumber of full
    time employees at the time the Fact Sheet was provided to Plaintiff.

- **"Multiple non-disclosed patents pending"**
  - o While Sionic Mobile did maintain a single patent for a loyalty program,
    it did not have any non-disclosed patents pending.

17

37.

In the Use of Funds Email dated November 1, 2017, Defendants outlined
what Sionic Mobile agreed to do with the funds from the Plaintiff Investment over
the upcoming 90-day period.  _See_ Ex. **F**.  Sionic Mobile agreed <u>not</u> to use any of
the Plaintiff Investment to repay "loans" from company executives and board
members, but instead to spend $400,000 on Compliance and Security, $300,000 on
Artificial Intelligence, $250,000 on order/pay ahead, $150,000 on automotive
platform integration, $50,000 on beacons and $700,000 to offset operating losses.

38.

Upon information and belief, Sionic Mobile did <u>not</u> use the Plaintiff
Investment as allocated in the Use of Funds Email, instead repaying alleged
"loans" from Defendant Herman and others in direct contradiction to the promises
made to Plaintiff prior to its investment.

39.

Sionic Mobile also provided Berkley with a written Debt Schedule.  _See_ Ex.
**H**.  Defendant Herman represented he had loaned Sionic Mobile more than
$550,000, however, upon information and belief this was simply delayed
compensation for salaries and benefits Herman claimed he was entitled to receive
from the company. Upon information and belief, these alleged "loans" were paid
back to Herman after Plaintiff's Investment.

18

40.

Defendants provided Plaintiff with the Email Update on November 20,

2017.  _See_ Ex. **J**.  Defendant Herman represented that (1) the agreement with

Southwest Airlines was almost completed, (2) the GM soft launch was going "fine",

and (3) Xevo, NorthOut and FreedomPay agreements were to be executed in mid-

December.  Based on actual financial from 2018 (_See_ Ex. **M**), none of the

statements were true, a fact known, but not disclosed to Plaintiff, by Defendants.

41.

The Proforma Spreadsheet provided by Defendants (_See_ Ex. **G**) contained

false and misleading statements that were relied upon by Plaintiff in making its

investment decisions, including the following:

**Tab "GM-RIG"**

- ***December 2017 Revenue***

    o *Carrabbas - $10,000*

    o *Hardees/Carl Jrs - $10,000*

    o *Five Guys - $10,000[1]*

    o These were present tense statements about existing

       revenues generated in December 2017, the same month

---

[1] Five Guys has disclosed that it never had any dealing with Sionic; see Exhibit N attached hereto.

as Plaintiff's Investment. This indicates that Sionic Mobile had finalized deals with these major restaurants, however upon information and belief, Sionic Mobile had no such agreements in place.

- ***10,500 RIG Vehicle Users in November 2017***

- ***11,550 RIG Vehicle Users in December 2017***
  - These were present and past tense statements about existing user engagement in November 2017 and December 2017. This indicates that Sionic Mobile was actually installed in GM vehicles and used by GM drivers, however upon information and belief, this relationship had not yet materialized.

### Tab "MRM"

- ***$260,982 MRM Revenue in January 2018***

- ***95,000 Starbucks Users in January 2018[2]***

- ***13,000 JetBlue Users in January 2018***
  - These were present tense statements about existing relationships with major brands expecting to dramatically grow revenues from $0 in December 2017 to $260,982 in January 2018, one month after

---

[2]  Starbucks has never had a contract with Sionic; see DE #121 in the record of this case.

Plaintiff's Investment. This suggests that Sionic Mobile had finalized deals with these major companies, however upon information and belief, Sionic Mobile had no such agreements in place.

- ***$1,112,798 MRM Revenue in February 2018***

- ***112,500 Wyndham Users in February 2018***

- ***190,000 Starbucks Users in February 2018[3]***

- ***78,000 JetBlue Users in February 2018***

- ***50,000 Hyatt Users in February 2018***

  o These were present tense statements about existing or pending relationships with major brands expecting to dramatically grow revenues from $0 in December 2017 to $1,112,798 in February 2018, two months after Plaintiff's Investment. This suggests that Sionic Mobile had near-finalized deals with these major companies, however upon information and belief, Sionic Mobile had no such agreements in place.

*Oral Misrepresentations*

42.

Because of the rushed investment process intentionally orchestrated by

---

[3] See  DE # 121.

Defendant Gahan and in order to avoid leaving a paper trail, Defendants insisted

on providing most of the detailed information by phone or during in-person

meetingsat Sionic Mobile's headquarters. One such meeting took place on

October 31, 2017, where Defendant Herman made a series of material

misrepresentations to Plaintiff which it relied upon to make its investment as

follows:

- ***Sionic Mobile is in the process of equipping over 100,000 merchant locations with in store iBeacons***. The company claimed it was installing Bluetooth devices at all of its merchants' locations to send merchant-branded "push" notifications to nearby customers' smartphones. Upon information and belief, the company has not installed a fraction of these, if any, yet.

- ***Sionic Mobile has already integrated its platform with Chase Payments, FreedomPay, MerchantLink, and Curbside***. Upon information and belief and based on 2018 and 2019 financial statements provided to Plaintiff, the company still does not have agreements or generate revenues from these institutions.

- ***Starting November 13, 2017, all new GM cars will be equipped with Sionic Mobile technology in their OnStar dashboard.*** Upon information and belief and based on 2018 and 2019 financial

22

statements provided to Plaintiff, the company's advertising solution is still not integrated into GM vehicles.

- ***Sionic Mobile needed Plaintiff's investment to cover expenses until March 2018 when sales will exponentially increase as a result of new partner relationships***. After seven (7) years of substantial losses, which expanded from approximately $2 million per year to $4.8 million in 2017, Sionic Mobile desperately needed to convince an investor that its financial situation was just about to substantially reverse.

- ***Sionic Mobile projects $374 million in revenue in 2018 and $1.4 billion in 2019.*** In reality, the company only generated revenues of $119,131 in 2017 and $157,727 in 2018. After seven years of minimal revenue, it was incredulous to claim that they would suddenly skyrocket to $374 million.

- ***Sionic Mobile's payment technology is already accepted at Panera Bread, Lowes, Banana Republic, California Pizza Kitchen, Domino's Pizza, Burger King, IHOP, Regal Cinemas, Office Depot, Krispy Kreme, Petco, Bed Bath & Beyond, Applebees, Chilis, Old Navy and Papa Johns.*** Upon information and belief and based on the company's 2018 and 2019 financial statements, Sionic Mobile had no

such agreements or relationships in place.

- ***Sionic Mobile is about to close the investment round and Plaintiff must immediately invest to preserve the low $2.00 price per share before its value skyrockets.*** The actions of Herman and Gahan allowed Sionic to use the same deceptive sales tactics, aspiring projections, claims of an impending sale, and claims that the company's stock was worth over $30.00 per share, throughout
- 2015, 2016 and 2017 to entice investors.

43.

Defendants also claimed in the October 31, 2017 meeting that they had already deployed Sionic Mobile's technology in all new GM vehicles starting on November 13, 2017 through GM's OnStar dashboard representing a total of 4 million new GM vehicles each year purportedly using Sionic Mobile's technology to promote merchants. Defendants claimed that Sionic Mobile was entitled to 45%of all of this massive advertising revenue generated through the OnStar dashboard.As a result, Sionic Mobile claimed they would have 11.5 million users and receive $148.5 million in revenue through this single relationship by the end of 2018. In actuality, the entire GM relationship has netted less than $0 in 2018, a far cry from  the $710 million claimed by the end of 2018.  (*See* Ex. **M**).

44.

By January 2018, Defendants claimed they would generate $260,000 in revenue from 95,000 Starbucks[4] users and 13,000 JetBlue users putting them in acash flow positive position immediately after Plaintiff's Investment.

45.

Finally, Defendant Herman claimed in the October 31, 2017 meeting that he was working to sell the entire business at $30 per share (valuing Sionic Mobile at over $1 billion), citing three companies with a "strong interest" in buying Sionic Mobile; Microsoft, Oracle and JPM Morgan Chase. This would result in a 15-times multiple on Plaintiff's investment in under one year.

46.

Upon information and belief, Gahan (enabled by Herman and Sionic) devised a scheme whereby investors in Sionic would be able to gift their over-valued shares to the Enduring Hearts charity established and controlled by Gahan in order to receive tax credits for their alleged losses resulting from an investment in Sionic. Gahan and Herman were actively engaged in these trans

47.

Unbeknownst to Plaintiff, Herman, Gahan and Sionic were actively involved in this charitable investment scheme prior to, and at the time of,

---

[4] See DE #121.

Plaintiff's investment.

48.

Even more troubling, upon information and belief, Herman, Gahan and Sionic were actively engaged in this scheme while soliciting Plaintiff's investment.

49.

Thus upon Plaintiff's investment, the shareholder value, number of shares and interest holders in Sionic were nothing like what was initially represented to Plaintiff by Defendants.  Thereby injuring Plaintiff and arguably defrauding Gahan's charity and improperly avoid tax payments owed to the federal government.

50.

Based on public filings, it appears that this scheme resulted in thousands of shares of Sionic being transferred by Sionic shareholders which amounted to millions of dollars in wrongfully inflated tax write offs.

51.

Again, none of this was disclosed to Plaintiff prior to its investment, even though it appears that Defendants were actively engaged in this scheme at the time.

## COUNT I

## SECURITIES FRAUD

*(10b-5 Misrepresentations and Omissions)*

52.

Plaintiffs incorporate by reference the allegations set forth in paragraphs 1-50 of this Complaint for Damages as if fully set forth herein.

53.

Defendants employed devices, schemes and artifacts to defraud Plaintiff into making its $1.6 million investment in Sionic Mobile in exchange for 800,000 shares of common stock including the deceptive sales techniques detailed in paragraphs 11, 22-32, the existing shareholder exit strategy detailed in paragraphs 16-19, the written misrepresentations detailed in paragraphs 33-40 and the oral misrepresentations detailed herein.

54.

Defendants engaged in acts, practices and courses of business which operated as a fraud or deceit upon Plaintiff including the deceptive sales techniques detailed in paragraphs 11, 22-32, the existing shareholder exit strategy detailed in paragraphs 16-19, the written misrepresentations detailed in paragraphs herein and the oral misrepresentations detailed herein.

55.

The misrepresentations and omissions detailed herein were "material" to Plaintiff and used by Plaintiff in making its decision to invest $1.6million in Sionic Mobile in exchange for 800,000 shares of common stock.

56.

The misrepresentations and omissions detailed in paragraphs 33-44 were made by Defendants with full knowledge of their falsity or impossibility at the time they were made and with the express intent of inducing Plaintiff to make its $1.6 million investment in the purchase of a security, i.e shares of common stock in Sionic Mobile.

57.

Plaintiff reasonably relied upon the material misrepresentations detailed herein as the individuals making the misrepresentations were in positions of superior knowledge and authority, including Defendant Herman whowas the president of Sionic Mobile and Defendant Gahan as a Board member.

58.

The misrepresentations and omissions detailed in paragraphs herein were the direct cause of Plaintiff's decision to invest in Sionic Mobile and were the direct and proximate cause of damages suffered by Plaintiff.

59.

Plaintiff has suffered damages as a direct and proximate cause of

Defendants' fraud in an amount not less than $1.6 million.

## COUNT II

## COMMON LAW FRAUD

60.

Plaintiffs incorporate by reference the allegations set forth in paragraphs 1-59 of this Complaint for Damages as if fully set forth herein.

61.

Defendants made intentional written and oral misrepresentations and omissions to Plaintiff as detailed herein above.

62.

These misrepresentations and omissions detailed in herein abovewere false and misleading at the time they were made as Defendants knew or should have known.

63.

Defendants made these false representations and omissions detailed herein with the sole purpose of enticing Plaintiff to invest in SionicMobile.

64.

The false representations and omissions detailed herein were material to Plaintiff's decision to invest in Sionic Mobile and Berkeley reasonably relied upon Defendants' statements as they were in superior positions of knowledge and

authority.

65.

The false representations and omissions detailed herein were the direct and proximate cause of Plaintiff's decision to invest in Sionic Mobile and the direct and proximate cause of its damages.

66.

Plaintiff did in fact invest in Sionic Mobile and has been damaged as a result thereof in an amount to be determined at trial.

## COUNT IV

## PUNITIVE DAMAGES

67.

Plaintiffs incorporate by reference the allegations set forth in paragraphs 1-66 of this Complaint for Damages as if fully set forth herein.

68.

Defendants' conduct as outlined herein showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences.

69.

Plaintiff is entitled to punitive damages from Defendants pursuant to O.C.G.A. Section 51-12-5.1 in an amount to be determined at trial.

**WHEREFORE**, Plaintiffs requests that the Court:

1) Grant judgment in favor of Plaintiffs on its claims for Securities Fraud, Common Law Fraud, and Punitive Damages;

2) Award damages to Plaintiffs in amounts to be determined at trial;

3) Grant Plaintiffs a jury trial on all claims triable by jury; and

4) Grant such other and further relief the Court deems just and proper.

This _____ day of June, 2021.

By: */s/ Jason B. Godwin*
Jason B. Godwin, Esq.
Georgia Bar No. 142226

**Godwin Law Group**
Attorney for Plaintiff
3985 Steve Reynolds Boulevard
Building D
Norcross, Georgia 30093
770-448-9925
770-448-9958
jgodwin@godwinlawgroup.com

**CERTIFICATE OF COMPLIANCE WITH L.R. 7.1, N.D. GA.**

The undersigned hereby certifies that this pleading was prepared using one of the font and point selections approved by this Court in L.R. 5.1C, N.D. Ga. Specifically, Times New Roman font in 14 point.

By: */s/ Jason B. Godwin*
Jason B. Godwin, Esq.
Georgia Bar No.  142226